# WHITNEY *v.* HAY.

EQUITY; SPECIFIC PERFORMANCE; PART PERFORMANCE.

1. Equity will decree the specific performance of an oral contract concerning land, which could be specifically performed if in writing, where there have been certain acts of part performance materially changing the situation of the complainant in respect to the subject matter of the contract.

2. Where a complainant in a suit to enforce a parol agreement to devise certain property to complainant in consideration of an agreement by the latter to take the promisor and his wife into his home and to take care of them for the rest of their lives, is shown to have been induced by such promise to change his mode of life and that of his family, to have assumed the new relation, to have entered into possession of the property in question, and to have faithfully performed the required services for a term of years, until the contract was repudiated by the promisor, specific performance will not be denied on the sole ground that the promised services were of such a nature

as that in case the complainant had refused or failed to render them a court of equity might not have been able to secure their certain and complete performance.

3. In such a case, where the promisor is living at the time of the decree, his title will be respected during his life, but a trust will be declared in favor of the complainant, ripening into title at the promisor's death, and the latter will be enjoined from making any other conveyance; and where the promisor is dead at the time of the institution of the suit, or dies *pendente lite*, the decree will run against his heirs at law or grantee to compel the immediate conveyance of the title.

4. The court will look to the situation and declarations of the promisor in such a case, the relations of the parties and the surrounding circumstances, as disclosed by all the testimony, in aid of the direct evidence, to ascertain the necessary terms of the contract.

5. The acts of part performance relied upon by the complainant, in such a case, must unmistakably tend to show not only that there has been an agreement to devise, but also one of the character claimed, upon which they must throw light and with which they must not be inconsistent in any particular, but they need not necessarily show the exact contract as alleged.

No. 813. Submitted November 21, 1898. Decided June 9, 1899.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia, in a suit for the specific performance of an alleged oral agreement. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. A. S. Worthington, Mr. B. F. Leighton* and *Mr. Geo. Francis Williams* for the appellant:

1. That a person may make a contract binding himself to dispose of his real estate by will, in a particular manner, and that such a contract may, under certain circumstances, be specifically enforced, is admitted; but such a contract is always looked upon with suspicion, and when sought to be established by oral testimony, and to be specifically enforced, must be clear and definite in all of its terms, must be fair and equitable in its provisions, based upon an adequate conideration, and fully or substantially performed by the part

seeking such relief.  Partial performance, and tender as to
the residue, are not sufficient.  The contract must not only
be mutual, but of such a character as to permit mutuality
of remedy; otherwise a court of equity will not lend its aid
to enforce it.  These principles are abundantly supported by
authority.  *Lord Walpole* v. *Lord Orford,* 3 Ves. Jr. 419;
*Mundorff* v. *Kilbourn,* 4 Md. 464; *Cox* v. *Cox,* 26 Grat. 308.

Representations made by one party, and acts done by an-
other upon the faith of such representations, may constitute
a contract that will be specifically executed; but where the
representation is only of a future intention, as to which the
party refuses to bind himself by contract, the engagement
must be regarded rather as of an honorary character, and
not enforceable as such in a court of equity.  *Wilkes* v. *Burns,*
60 Md. 64.  The doctrine last announced was affirmed in
the cases of *Baltimore* v. *Williams,* 6 Md. 235, and *Worthing-
ton* v. *Rich,* 77 Md. 265.  There are several cases arising in
our jurisdiction, where the doctrine here sought to be en-
forced is clearly announced.

In *Lipscomb* v. *Watrous,* 3 App. D. C. 1, the court held that
all the terms of the contract must be clearly proved in a
suit for specific performance.  It is fatal to the case if there
be doubt whether defendant did, in fact, make the agree-
ment.  To the same effect is *Waters* v. *Ritchie,* 3 App. D. C.
388, 389.  Even if the contract be in writing, it must be
clear in all of its terms, or it will not be specifically enforced
in equity.  *Repetti* v. *Maisick,* 6 Mackey, 366; *Rivers* v. *Rivers,*
3 Des. Eq. Rep. 195; *Shakespere* v. *Markham,* 10 Hun, 322:
S. C. 72 N. Y. 200.  Even if there had been an attempt to
make a contract by which the property of Dr. Piper was to
go to the appellee at Dr. Piper's death, such contract could
not be specifically enforced if there was any doubt that Dr.
Piper understood that he was binding himself absolutely.
*Coles* v. *Vane,* 10 Paige Ch. 526.

2. The nature of the alleged contract was of such a char-
acter as to preclude a decree for specific performance thereof,

unless the appellee had performed the entire contract on his part, and done all that was required to be done by him prior to his seeking specific performance. Partial performance, and tender of the residue, is not sufficient to entitle him (the appellee) to relief. The consideration for the alleged agreement consisted not only of the home to be provided by the appellee, but of the personal service to be performed by himself and the members of his family in respect to Dr. Piper and his wife. It would be impossible for a court of equity to compel Mr. Hay or his family to perform his part of the agreement. Courts of equity do not enforce contracts for personal service. No well considered case can be found in the books where a bill for such purposes has been sustained. There was therefore no mutuality of remedy, and the cases which have sustained a bill for specific performance of contracts for maintenance and support, are cases where the contract has been entirely or substantially performed. *Cooper* v. *Pena*, 21 Cal. 410; *Bassault* v. *Edwards*, 43 Cal. 465. That a court of equity will not compel specific performance of a contract for personal services, is abundantly established by authorities. *Marble Co.* v. *Ripley*, 10 Wall. 350; *Benedict* v. *Lynch*, 1 Johns. Ch. 378; *Adderly* v. *Nixon*, 1 Sim. & Stu. 603. The only seeming qualification of the rule that there must be mutuality of remedy, in order to permit the specific performance of a contract, arises in the case where a contract for the purchase of land is signed by the party to be charged, and a bill for specific performance is brought by the party who does not sign the contract. The allowance of the remedy in this case, has been criticised in numerous cases. *Laurenson* v. *Butler*, 1 Sch. & Lef. 13; *Benedict* v. *Lynch*, 1 Johns. Ch. 373; *Classon* v. *Bailey*, 14 Id. 484; *Davis* v. *Shields*, 26 Wend. 262; Willard's Equity, 267, 268. And it has been justified solely on the ground that where an action for specific performance was instituted by the party not signing the agreement, the act of filing the bill made the remedy mutual. See *Bassault* v. *Edwards*,

*supra,* and cases there cited; *Hamblin* v. *Dinneford,* 2d Ed. Ch. 527; *Clark* v. *Price,* 2 Wils. Ch. Cas. 157; *Kimball* v. *Keene,* 6 Sim. 333 ; 2 Story's Equity, Sec. 723.

3. The contract in controversy relates to an interest in real property, and is therefore within the Statute of Frauds, and in order to be valid, must either be evidenced by an instrument in writing signed by the said Richard U. Piper, or, if oral, there must have been such part performance thereof, as to take it out of the statute. A written agreement is one in which all of its terms are in writing, and in respect to which oral testimony is not required to establish any of its provisions. Should recourse to oral evidence be necessary to establish a single provision of a contract, the residue of which is in writing, the contract would thereby be reduced to the grade of an oral contract, and would not be such an instrument in writing as is required by the Statute of Frauds. The contract upon which the appellee relies is admittedly oral, and there was no such part performance thereof as takes it out of the Statute of Frauds. It appears from the evidence that the possession of the appellee was not that of a purchaser taken in pursuance of a contract to convey or devise to him, but was a contract of letting, pure and simple. That possession so taken is insufficient to gratify the law as to part performance of an oral contract for the conveyance of land, is apparent, not only on principle, but by the authorities. *Ham* v. *Goodrich,* 33 N. H. 38.

In order to amount to a part performance, the acts must be unequivocally referable to the agreement, and the ground on which courts of equity have allowed such acts to exclude the operation of the statute, is fraud. A party who has permitted another to perform acts on the faith of an agreement shall not insist that the agreement is bad, and that he is entitled to treat these acts as if it had never existed, but the acts, in order to be within the principle, must be referable to the contract. *Ham* v. *Goodrich, supra*; *Lester* v. *Kinney,* 37 Conn. 9; *Halston* v. *Railroad,* 51 Ga. 199; *Phillips*

v. *Thompson*, 1 John. Ch. 149; *Nevin* v. *Belknap*, 2 John. 587; *Austin* v. *Davis*, 128 Ind. 472; *Graham* v. *Dodge*, 122 Ill. 529; *Bond* v. *Sheehan*, 132 Ill. 314; *Ferbrache* v. *Ferbrache*, 110 Ill. 210; *Wood* v. *Thornly*, 58 Ill. 465; *Bender's Admr.* v. *Bender*, 37 Pa. St. 420.

The rule is the same even though the contract be established by parol evidence. *Buckmaster* v. *Harrop*, 7 Ves. 347.

The doctrine announced in *Ham* v. *Goodrich, supra,* is fully sustained by the English authorities. *Clinan* v. *Cooke*, 1 Sch. & Lef. 41; *Morphett* v. *Jones*, 1 Swanst. 181.

Delivery of possession under a parol contract is not of itself sufficient to justify specific performance; there must be besides, an expenditure of money in the improvement of the land. *Purcell* v. *Coleman*, 6 D. C. 59. In the same case, on appeal to the Supreme Court of the United States, it was held that there must be full, satisfactory and indubitable proof of the contract, in all its terms, and that delivery of possession must have been made in pursuance of the contract. *Purcell* v. *Minor*, 4 Wall. 513.

In the case of *McCartney* v. *Fletcher*, 11 App. D. C. 1, 18, it was held that where evidence of part performance, to take a case out of the Statute of Frauds, is relied on, it is not only indispensable that the acts done should be clear and definite, and refer exclusively to the contract, but the contract should be established, by competent proof, to be clear, definite and unequivocal in all of its terms. See, also, *Barbour* v. *Hickey*, 2 App. D. C. 207.

The recent case of *Maddison* v. *Alderson*, 8 App. Cas. 467, is strictly in point. It is there held that continuance of a woman in service as housekeeper, without wages, and a forbearance to press for wages due her in that capacity, were not sufficient part performance of a parol agreement, whereby her employer, in consideration thereof, promised to leave her a life interest in an estate. The court held that the alleged act of part performance was not unequivocally referable only to the alleged agreement to leave her a life

interest. This case reverses S. C. 5 Ex. D. 293, and over-rules *Loffus* v. *Maw*, 3 Giff. 592.

Payment of the contract price by the purchaser, is not of itself sufficient part performance to take the case out of the statute. Part payment, or even full payment of the purchase money will not relieve an oral contract for the purchase of land from the condemnation of the statute. The recovery of the money so paid, with interest for its detention, by an action at law, is universally regarded as an adequate remedy. *Clinan* v. *Cooke, supra; Hughes* v. *Morris*, 2 DeG. M. & G. 356; *Brown* v. *Brown*, 33 N. J. Eq. 660; *Glass* v. *Hurlbert*, 102 Mass. 28. The oral agreement must have been so far executed that a refusal of full execution would operate as a fraud upon the party seeking relief, and place him in a situation where compensation in damages is not an adequate remedy. *O'Reilly* v. *Thompson*, 2 Cox, 273; *Wright* v. *Puchett*, 22 Gratt. 374.

The part performance of the alleged contract on the part of the appellee under the circumstances disclosed in the evidence, is not the equivalent of paying the entire consideration in cash, in contracts where money is the consideration. Such care as was taken, and services as were rendered, if not already discharged, can be readily compensated in money. *Frame* v. *Dawson*, 14 Ves. 388.

The alleged contract left Dr. Piper in full control of his property during his life. He could sell and dispose of it as he pleased; he could make a gift of the property at his pleasure, so that the gift was absolute and immediate. *Austin* v. *Davis, supra; Lewis* v. *Maddox*, 17 Ves. 50; *Bradish* v. *Bradish*, 2 Ball. & Bea. 489; *Randall* v. *Willis*, 5 Ves. 262; *Johnson* v. *Hubbell*, 10 N. J. Eq. 332. The conveyance in the case at bar was a deed in ordinary form, conveying the property in fee simple, unto the appellant. It was such a conveyance as he had power to make, even admitting that a contract had been established, by which he was to devise all the property he possessed at the time of his death to the

appellee.   The consideration for the conveyance was services
to be rendered, and the making of it was neither in fact nor
in law a fraud upon the appellee.

In admitting that Dr. Piper had the *jus disponendi* of his
property, until his death, and the right to do with it as he
pleased, the appellee, in effect, concedes that the conveyance
to appellant is good from the time it was made, until the
death of Dr. Piper, and that he must account to the appel-
lant for the reasonable rental value of the property during
that period.

4. The alleged contract was never performed by the ap-
pellee.   The evidence shows that he neither clothed Dr.
Piper nor his wife; that he did not supply them with medi-
cal attendance when ill.   All that was done by the appellee
in the fulfilment of his contract, was to permit Richard U.
Piper and his wife from the spring of 1887, till the summer
of 1892, to eat at his table; for which Dr. Piper paid him
by an allowance on the rent of the house in which the fami-
lies resided.

5. Most of the cases found in the books, seeking specific
performance of contracts to make wills, are cases which arise
under precise ante-nuptial agreements, and the covenants
therein contained, and are of little value, in point of au-
thority, in the case at bar.   No case has fallen under the
observance of counsel for appellant, presenting the features
developed in this case, where specific performance has been
sought, much less decreed.   The cases most strongly favor-
ing the appellee, are the three following: *Van Duyne* v.
*Vreeland,* 12 N. J. Eq. 143; *Sharkey* v. *McDermott,* 91 Mo.
647; *Brown* v. *Sutton,* 129 U. S. 239.   But these cases will
be found upon examination not to be applicable to the case
at bar.   In *Brown* v. *Sutton,* the terms of the contract, while
oral, were clearly established to the satisfaction of the court;
it was fully performed by complainant; it was equitable in
character; the property promised to be given no more than
compensated the complainant for the services rendered; it

consisted not of the whole of decedent's estate, but only of a very small portion thereof; the property was bought for complainants in fulfilment of the contract proved as aforesaid, and they were placed in actual possession, not as tenants, but as owners. Not a single authority is cited in the opinion of the court, nor is the law upon the subject of part performance, and the other points considered in this brief, discussed or considered by the court, in any manner.

*Mr. J. M. Wilson, Mr. A. A. Hoehling, Jr.*, and *Mr. E. B. Hay* for the appellee:

1. The principles relied upon are so generally sustained by all the authorities that it almost becomes common law; but the case in point directly is *Brown* v. *Sutton*, 129 U. S. 238: "Where one purchased and took the title of land in his own name, but with the intention and under the verbal promise to convey it to another, upon consideration that she should take care of him during the remainder of his life, as she had done in the past, and places her in possession of the property, and she does so take care of him during his life, she is entitled to a specific performance of the promise and to a conveyance of the title to her, after his death, by his executors and trustees." See, also, *Atkinson* v. *Jackson*, 8 Ind. 31; *Townsend* v. *Vanderwerker*, 160 U. S. 180.

2. Specific performance of parol agreement will be compelled by a court of equity where one party to it has wholly or partially performed it on his part, so that its non-fulfilment by the other party is a fraud. *Johnson* v. *Hubbell*, 10 N. J. Eq. 332; *Rivers* v. *Rivers' Exrs.*, 3 Desaus. 195; *Izard* v. *Middleton*, 1 Desaus. 116.

3. An agreement, on good consideration, and without fraud or undue influence, to devise land, is valid, and will be enforced by compelling a conveyance from heirs of the promisor or purchaser with notice from him in his lifetime. *Rarsell* v. *Stuker*, 41 N. Y. 48; *Davidson* v. *Davidson*, 13 N. Y. 246; *Van Duyne* v. *Vreeland*, 12 N. J. 143; *Gupton* v. *Gupton*,

47 Mo. 37; *Hyatt* v. *Williams*, 78 Mo. 214; *Twist* v. *George*, 33 Mich, 253; *Warren* v. *Warren*, 105 Ill. 568; *Pfluger* v. *Pultz*, 43 N. J. 440.

An agreement of this character was upheld in *Brinker* v. *Brinker*, 7 Pa. St. 53, wherein the complainant, after the agreement, was put in the possession of the property contracted to be bequeathed, and the court sustained the position of the complainant, not because of delivery of possession of the property contracted to be bequeathed, but because in conformity to the agreement the will had been executed. See, also, *Tolson* v. *Tolson*, 10 Md. 159; *Willett* v. *Carroll*, 13 Md. 459; *Sutton* v. *Hayden*, 62 Mo. 101.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. This is an appeal from a decree sustaining the original and supplemental bills of complainant Edwin B. Hay, filed to secure the specific performance of an alleged contract or agreement, whereby one of the defendants, Richard U. Piper, in consideration of the promise of complainant to receive him and his wife into his home for the remainder of their lives, and to furnish them board and treat them with affectionate care as if parents, had agreed to make title by will to the complainant to lots 139, 140 and 141 of George Emmons's subdivision of square 193 in the city of Washington.

The defendants named in the original bill are Anna V. Whitney, of Newport, Maine; Richard U. Piper, and George Moore, trustee.

The contract, alleged to have been made between complainant and Richard U. Piper, was not in writing, and part performance of it is relied on to take it out of the operation of the Statute of Frauds.

The agreement is set out fully in the bill, and as it will appear in a review of the evidence need not be stated here. The acts of part performance by complainant, consisting, in part, of the care and maintenance of defendant and his wife

from March, 1887, to August, 1892, are also alleged and will be mentioned in reviewing the evidence.

It is further alleged that the defendant Piper on July 1, 1888, made a will in pursuance of the agreement, devising the property aforesaid, with other property situated in Chicago, to the complainant in trust for his wife, Elizabeth F. Piper, during her life, with remainder in fee to complainant; and another, December 8, 1892, during the last illness of Elizabeth Piper, devising all of his estate to the complainant.

Defendant Piper and his wife were then at Saratoga Springs for their health. The wife died, and defendant Piper, being very weak in body and mind, was forcibly carried away to Chicago by one S. G. Thomas, who was his agent in that city for property situated therein. Whilst under the control of said Thomas and through his coercion, defendant Piper made a deed conveying the Chicago property and the Washington lots aforesaid to defendant Moore in trust for the security of certain contracts with said Thomas. This deed was dated October 17, 1893, and recorded in Washington September 18, 1895. (It has since been annulled by proceedings instituted in Chicago, and Moore, trustee, has executed a release to defendant Piper of the Washington property, which is made an exhibit to the answer of Anna V. Whitney.)

That Anna V. Whitney, a niece of defendant Piper, went to Chicago and took him to the house of her mother in Newport, Maine, where he has since remained. That, acting under the influence and control of his said niece, the said Piper conveyed the aforesaid Washington property to her by deed dated August 4, 1896, and recorded October 17, 1896, in the District of Columbia. Alleging performance of his agreement in the past and readiness to perform, present and future, and fraud in the execution of the conveyances aforesaid, complainant prayed an injunction, *pendente lite,* to restrain the defendants from encumbering

or conveying the property, and for a decree declaring the defendant, Anna V. Whitney, to be a trustee of the legal title for the complainant, in accordance with the agreement between him and defendant Piper, and vacating the deed to defendant Moore, trustee.

The first supplemental bill was filed April 12, 1897, alleging the institution of proceedings for ejectment by Anna V. Whitney before a justice of the peace under the landlord and tenant act, and praying an injunction staying the same, which was granted.

A second supplemental bill was filed November 2, 1897, alleging the death of defendant Piper on August 4, 1897, and changing the prayer for relief against Anna V. Whitney to one for an immediate conveyance by her to the complainant in fee.

The answers of the defendants, Piper and Whitney, denied the contract or agreement set out in the bill.

2. It appears from the evidence that the complainant, Edwin B. Hay, was a lawyer residing in the city of Washington when his acquaintance with Dr. Richard U. Piper began. He was also an expert in handwriting. Dr. Piper had been a physician and was a man of scientific attainments. In later years his profession was that of an expert in handwriting.

The two became acquainted with each other in 1882, during a protracted trial in Yankton, Dakota, in which they were expert witnesses on behalf of the United States. They became intimate and occupied the same room. Complainant was a young man about 32 years of age and Dr. Piper was about 65. Dr. Piper was married but had no children. His wife was a few years younger than he. They lived in apartments in Chicago, where the doctor owned some real estate. At his request, complainant stopped at Chicago on his way home and paid him a visit, making then the acquaintance of Mrs. Piper. They met again in Philadelphia early in 1883, where they were also expert witnesses in the

same case.　Mrs. Piper was there also.　By invitation of complainant, they stopped in Washington, on their way to Chicago, to pay a visit of a few days to him and his family, then living in a house of moderate size on P street.　The visit was extended to about six weeks.　During this visit Dr. Piper and his wife seemed to have conceived great affection for the complainant and his wife, Mrs. Florence Hay.　Whilst at Philadelphia in January, 1883, Dr. Piper wrote a letter to complainant expressing his pride in him and concluding with the wish that he could call him his "big boy in deed and in truth."　Constant correspondence was maintained between them after the Pipers' return to Chicago.　Mrs. Piper wrote nearly all the letters on their side.　These were generally addressed, "Dear Son Edwin and Daughter Florence," and signed "Father and Mother Piper."　December 23, 1885, Dr. Piper wrote to complainant as "My Dear Boy," and referring to news of the latter's recent illness, said : "I wish that we were in Washington to look after you a little—perhaps we could help you some in that direction.　By the way, what do you think of our looking to your city as a residence for the few years still perhaps left to us?　Suppose I could command, say twenty-five thousand dollars certainly, and perhaps nearly as much more, what would you think of it?　We have no relations or friends to whom we owe anything as to the final disposition of our estate.　Good night, with much love to you all, son, daughter, grandchildren, and all."　On January 14, 1886, Dr. Piper and his wife, about to leave for San Francisco, where he was employed in a case, wrote as follows:

"DARLING EDWIN AND FLORENCE :

"You will appreciate, dear ones, the estimation in which we hold you when I tell you that I have today written a will from the Doctor's dictation, and with my full approval, in which we bequeath to you the whole of our property with the exception of a few legacies amounting to about five hundred dollars.　This will is deposited with Judge Charles

H. Wood, 126 La Salle street, Oriental building, a fine
noble gentleman, whom Edwin will like and one who will
be glad to get him to attend to any business which he may
have in Washington. In case of Doctor's death Edwin and
I are appointed executors of the Doctor's will. In case of
our death by accident on the journey, Edwin will attend to
all business connected with all property left by us, which
with the exception of the legacies goes to Edwin as above
stated. He will of course find the will deposited as above
said with Judge Wood, and with it, a schedule of property,
and also a key to box in safety deposit vault of First Na-
tional Bank, containing property as set forth in schedule
above noticed. Edwin will look after this matter as soon
after our death as possible, as there are some things in the
papers with the will which will need immediate attention.
"As ever affectionately,

"FATHER AND MOTHER PIPER.

"In case we are killed on our journey, going or returning,
Edwin will find in connection with the will, what we would
desire to have done with our remains."

June 8, 1886, a letter similarly addressed and signed,
reads thus, as copied in the record:

"And now dear children I need not tell you how much
we want to see you and the darling children. . . .
When we meet, which we shall do some time if nothing
providential prevents, when I trust all can be arranged to
the satisfaction of you our dear children and ourselves.
. . . Mr. Hyde to whom we introduced you, is an excel-
lent man, knows nothing of the relation we bear to each
other particularly, only of course we tell him as we do
everybody that you and yours are very dear to us, and that
we look upon you as our children; we did not enter into
further particulars."

Affectionate letters continued to pass, and one written by
Mrs. Piper and signed as usual, "Father and Mother Piper,"

contained this sentence: "We shall be most happy to come to Washington, when it is convenient all around; more of that dear Edwin and Florence, if we reach Chicago in safety."

November 7, 1886, another letter enclosed a duplicate draft of the Bank of California on a Chicago bank for $5,300, which was sent, as explained, to insure against loss should Dr. Piper and wife meet with an accident on their way east.

Another letter of November 19, 1886, states cash on hand of $20,000 and asks complainant's advice as to its investment. It seems that Mrs. Hay was averse to taking Dr. Piper and Mrs. Piper into her house, but finally consented and in the spring of 1887 she joined her husband in expressing consent. In reply to this came a letter of March 11, 1887, addressed, "My dear son Edwin," as follows:

"I feel, however, that the Doctor must go somewhere before that time, and if it is not perfectly convenient for us to come to Washington at present, we will wait and take a short trip to Colorado or somewhere else. Now, my dear son and daughter, tell us the exact truth with regard to this matter, as there *should surely be no hesitation in stating facts between us.* Our best love to darling Florence and the babies, and a large share from us both for yourself.

"As ever affectionately,

"FATHER AND MOTHER PIPER."

Another letter was written March 18, 1887, in which the following occurs:

"I felt very anxious about him; I am still; and as physicians and friends all insisted that a change was better for him than anything else, and he is so much attached to you all, that I ventured to press the matter to our children, so I am sure you will appreciate. If we live and Doctor is able, I think we will start for W. some time next week, today being Friday, the 18th. I would not come now, as you are

situated, did I not feel so anxious about the Doctor, and I can not get him started for any other place now, although he did think he would go to Colorado; but he dreads going among strangers.

"As ever affectionately;

"FATHER AND MOTHER PIPER."

March 25, 1887, they came to the house of complainant. Two rooms were given over to their exclusive use, and they were treated as members of the family. They paid no board during their stay with complainant, from first to last, and contributed nothing to payment of expenses.

Complainant had, in the meantime, prepared for this increase of his family by making additions to his house, repairing, and so forth, at considerable expense.

Appreciating the desirability of more room, Dr. Piper had expressed the intention to buy lots and build a larger house. He and complainant soon agreed in selecting the Corcoran street lots, aforesaid, which were purchased, paid for and conveyed to Dr. Piper. An architect and a builder were selected by complainant, and the erection of a house, planned to suit him and his wife, was begun August 1, 1887. In addition to meeting the wishes of complainant the house was made large enough to give Dr. Piper and wife a bed-room, sitting-room, private bath-room, and an extra room for his pictures, where he also occupied some leisure in painting. The house was completed about August 1, 1888, and all parties moved in and made it their joint home and lived as they had been doing.

Dr. Piper was a dyspeptic and required special articles of food. He required his meals to be served precisely on time: breakfast, 8 a. m.; lunch, 12, and dinner at 6 p. m.

Necessity of conforming to these habits, and the size of the new house increased complainant's expenses considerably, through increase of servants, cost of coal, gas, water, and so forth. Dr. Piper was a man of whims, somewhat

selfish, and was not always easy to please.   His wife appears to have been utterly unselfish, and of a most affectionate nature.   She was constant in her devotion to her husband's comfort and happiness, and in her efforts to insure the continuance of the happy relations of the new family.   They remained in the house under the care of complainant and wife continuously until August ·26, 1892.

On that day they went to Saratoga for the benefit of the doctor's health, and did not return.   She fell sick there and died January 3, 1893.   Her remains were brought to Washington by complainant and deposited in the vault at Rock Creek Cemetery.   Dr. Piper, being then feeble in body and mind, was unable to return.

Whilst in this condition he was removed to Chicago by S. G. Thomas, without the knowledge of the complainant, and there kept under his influence and control until about June, 1895, when the defendant, Anna V. Whitney, removed him to the home of her mother in Newport, Maine, where he remained until his death.   Complainant seems to have made reasonable efforts, from time to time, to have him return to his home.

Dr. Piper was sometimes irritated during his residence with complainant, and expressed dissatisfaction at such times to a few persons;· but seems to have been, in the main, as happy and contented as could be expected of one of his age and health.   His affection for complainant was apparently great, and that of his wife was apparently very strong.

Many witnesses, with excellent opportunities of observation, testified to the uniformly excellent, kind, and affectionate care of Dr. and Mrs. Piper, by the complainant and his family, from the time of their coming to his home in March, 1887, until their departure for Saratoga on August 26, 1892.

Among these witnesses were James Schouler, the eminent lawyer and author, and his wife.   The latter was a cousin

of Mrs. Piper. They made frequent visits to Washington during the time, and their relations with Dr. and Mrs. Piper were intimate. Mrs. Schouler testified that "they expressed themselves as being very happy in the mutual relations existing between themselves and Mr. and Mrs. Hay. They were treated in the household as if they were their own parents—with the utmost kindness, consideration and affection."

One of Dr. Piper's peculiarities seems to have been the frequent making of wills. In all of these, during that period, complainant was remembered. Notwithstanding the will made before coming to Washington, he thought it best to make another after the purchase of the Corcoran street property. He caused this to be prepared by a lawyer and with special mention of that property, and left his entire estate, with the exception of some small legacies, to complainant.

Some testimony was introduced by the defendants going to show that he was somewhat dissatisfied with his relations with the complainant's family, one of the causes of which was Mrs. Hay's entering the Catholic Church. Influenced by this state of mind, in June, 1892, he had a lawyer to prepare another will, and destroyed the former one.

By this will he left all of his estate to his wife, directing her, however, to pay $1,000 to his sister, Mrs. Whitney. The last clause was: "I desire that my wife shall at her death, if she so chooses, give Edwin B. Hay the sum of $10,000."

But it further appears that on the day before starting to Saratoga, August 25, 1892, he and his wife each made and signed wills. These were found in an envelope in the drawer of a table in their rooms in the Corcoran street house more than two years afterwards.

This will of Doctor Piper, conditioned upon the predecease of his wife, gave $2,000 to Mrs. Whitney, $500 and one of his paintings to a brother-in-law, and the remainder

of his estate, real and personal, to complainant, who was also appointed executor.

3. The facts above recited as relied on to show the part performance of an agreement relating to the property in controversy, are thoroughly well established. To them, concurrent with the testimony relating particularly to the terms of that agreement, must be applied the appropriate principles of the doctrine of part performance in equity through which the specific execution of verbal contracts, concerning land, may be enforced notwithstanding the provisions of the Statute of Frauds. Before stating this additional evidence and our conclusions therefrom, those principles will be considered.

(1) The Statute of Frauds in force in this District is identical with the English statute of 29 Charles II.

The limitations upon the operation of that statute, imposed by the part execution of an oral contract, were thus explained in a recent case in the House of Lords by Lord Chancellor Selborne:

"It has been determined at law (and, in this respect there can be no difference between law and equity), that the 4th section of the Statute of Frauds does not avoid parol contracts, but only bars the legal remedies by which they might otherwise have been enforced. . . . From the law thus stated the equitable consequences of the part performance of a parol contract concerning land seem to me naturally to result. In a suit founded on such part performance, the defendant is really 'charged' upon the equities resulting from the acts done in execution of the contract, and not (within the meaning of the statute) upon the contract itself. If such equities were excluded, injustice of a kind which the statute can not be thought to have had in contemplation would follow. Let the case be supposed of a parol contract to sell land, completely performed on both sides, as to everything except conveyance; the whole purchase money paid; the purchaser put in possession

expenditure by him (say in costly buildings) upon the property; leases granted by him to tenants. The contract is not a nullity; there is nothing in the statute to estop any court which may have to exercise jurisdiction in the matter from inquiring into and taking notice of the truth of the facts. All the acts done must be referred to the actual contract, which is the measure and test of their legal and equitable character and consequences. If therefore, in such a case, a conveyance were refused, and an action of ejectment brought by the vendor or his heir against the purchaser, nothing could be done towards ascertaining and adjusting the equitable rights and liabilities of the parties without taking the contract into account. The matter has advanced beyond the stage of contract; and the equities which arise out of the stage which it has reached can not be administered unless the contract is regarded. The choice is between undoing what has been done (which is not always possible, or, if possible, just), and completing what has been left undone. The line may not always be capable of being so clearly drawn as in the case which I have supposed; but it is not arbitrary or unreasonable to hold that when the statute says that no action is to be brought to charge any person upon a contract concerning land, it has in view the simple case in which he is charged upon the contract only, and not that in which there are equities resulting from *res gestae* subsequent to and arising out of the contract. So long as the connection of those *res gestae* with the alleged contract does not depend upon mere parol testimony, but is reasonably to be inferred from the *res gestae* themselves, justice seems to require some such limitation of the scope of the statute, which might otherwise interpose an obstacle even to the rectification of material errors, however clearly proved, in an executed conveyance founded upon an unsigned agreement." *Maddison* v. *Alderson,* L. R. 8 App. Cas. 467, 474, 475.

Upon the ground so well stated by Lord Selborne, or in

accordance with other views, differently expressed but not different in point of substance, courts of equity early began, and have continued, to decree the specific performance of oral contracts concerning land, which could be specifically performed if in writing, where there have been certain acts of part performance materially changing the situation of the complainant in respect of the subject matter of the contract.

"The general principle to be extracted from the authorities," says Mr. Justice Brown, " is that if the plaintiff, with the knowledge and consent of the promisor, does acts pursuant to and in obvious reliance upon a verbal agreement, which so change the relations of the parties as to render a restoration of their former condition impracticable, it is a virtual fraud upon the part of the promisor to set up the statute in defense, and thus to receive to himself the benefits done by the plaintiff, while the latter is left to the chance of a suit at law for the reimbursement of his outlays, or to an action upon a *quantum meruit* for the value of his services." *Townshend* v. *Vanderwerker*, 160 U. S. 171, 184.

(2) The principle applies not only in the case of agreements, where the date of the promised conveyance is fixed and certain, but also where it is unfixed and indefinite. *Brown* v. *Sutton*, 129 U. S. 238, 243; *Townshend* v. *Vanderwerker*, 160 U. S. 171; *Lamb* v. *Hinman*, 46 Mich. 112; *Young* v. *Young*, 45 N. J. Eq. 27.

It is also well settled that a promise as alleged in this case, to transfer the title by will, is equally enforceable with one to transfer by deed. The material thing is the certain intention to transfer the property, and not the manner in which the transfer of title is to be effected. *Gupton* v. *Gupton* 47 Mo. 37 (cited 160 U. S. p. 184); *Sharkey* v. *McDermott*, 91 Mo. 647 ; *Carmichael* v. *Carmichael*, 72 Mich. 76, 85 ; *Pfluger* v. *Pultz*, 43 N. J. Eq. 440 ; *Van Duyne* v. *Vreeland*, 11 N. J. Eq. 370, 381.

In the cases cited immediately above, the agreement was

between aged owners of land peculiarly situated, on the one hand, and young persons—sometimes children and sometimes not of kin—on the other; the former promising to make title to the latter, by will, in consideration of personal services, care, maintenance, and the like, to be received during life. When the latter have been induced by the promise to change their mode of life, have assumed the new relation, entered into possession, and faithfully and completely performed the required services for a term of years, and the contract has then been repudiated by the promisor, without justification, it does not lie in his mouth or that of his heirs or grantees with notice to resist a demand for the appropriate specific enforcement on the sole ground that the promised services were of such a nature as that in case the complainant had refused or failed to render them a court of equity might not be able to secure their certain and complete performance. Where there has been no such failure or refusal, the mere possibility of future difficulty on that account ought not to be invoked on behalf of a wrongdoer.

The irreparable injury to the promisee, who has faithfully performed, the impracticability of his adequate compensation at law, and the consequent fraud that would be perpetrated upon him, furnish substantial and sufficient ground for his equitable relief by way of specific performance. See, also, *Warren* v. *Warren*, 105 Ill. 568, 574; *Brown* v. *Sutton*, 129 U. S. 238, 243.

(3) In some of the cases where the promisor was living at the time of the decree, his title was respected during life but a trust was declared in favor of the complainant, ripening into title at the promisor's death, and the latter was enjoined from making any other conveyance. Provision was also made for securing performance by the complainant of his obligation to the end. Where the promisor was dead at the time of the institution of the suit, or died *pendente lite*, the decree ran against his heirs at law or grantee to compel the immediate conveyance of the legal title.

(4) The verbal agreement sought to be enforced must be a complete contract and certain in its essential terms. It must be clearly and distinctly proved substantially as alleged. The certainty of proof required to establish it is not absolute but reasonable. *Neale* v. *Neales,* 9 Wall. 1, 12; Pomeroy, Specific Performance, Sec. 137; *Mundy* v. *Jolliffe,* 5 Myl. & Cr. 177. In that case (cited with approval in *Neale* v. *Neales, supra*), Lord Cottenham said: "Courts of equity exercise their jurisdiction in decreeing specific performance of verbal agreements, where there has been part performance, for the purpose of preventing the great injustice which would arise from permitting a party to escape from the engagements he has entered into, upon the ground of the Statute of Frauds, after the other party to the contract has, upon the faith of such engagement, expended his money, or otherwise acted in execution of the agreement. Under such circumstances, the court will struggle to prevent such injustice from being effected, and with that object it has at the hearing, when the plaintiff has failed to establish the precise terms of the agreement, endeavored to collect, if it can, what the terms of it really were."

This means, substantially, that the court will look to the situation and declarations of the promisor, the relations of the parties, and the surrounding circumstances as disclosed by all the testimony, in aid of the direct evidence, to ascertain the necessary terms of the contract. This is what was done in the case of *Brown* v. *Sutton,* 129 U. S. 238, 242. Referring in that case to the incompetency of Mrs. Sutton and her husband as witnesses, and the absence of any correspondence or written words, and to the consequent difficulty of proving a direct and specific contract, it was said: "Any such promise must be largely inferred from the situation and circumstances of the parties, and must depend almost wholly on verbal statements made by Mr. Kenyon (the deceased promisor) to others."

(5) The acts done by the plaintiff in part execution must,

as we have seen, not only have occurred after the agreement had been definitely concluded, and with the knowledge and consent of his promisor, but also have been of a nature such as to change the relations of the parties to each other to such an extent as to render a restoration of their former condition impracticable.

It is upon this change of relations, compensation for which can not be readily and accurately estimated, that the courts of equity act, and it furnishes one of the reasons why the payment of the purchase money alone is not regarded as sufficient. Something more is required, as, for example, possession. But this possession need not necessarily be exclusive, unless made essential by the nature and terms of the agreement. As has been said by Judge Cooley:

"The reason why taking possession under an oral contract is recognized as a ground for specific performance when payment of the purchase price is not, is that in one case there is no standard for the estimate of damages when the contract is repudiated, and in the other there is a standard that is definite and certain. A purchaser who takes possession of land under an oral purchase is likely in so doing to change very considerably—perhaps wholly—the general course of his life as previously planned by him; and if he is evicted on a repudiation of the contract, any estimate of his loss by others must in many cases be mere guesswork. The rule therefore rests upon the element of uncertainty, and not upon any technical ground of exclusiveness in the possession." *Lamb* v. *Hinman*, 46 Mich. 112.

It is in accordance with this doctrine that the qualified possession of those cases before referred to, as enforcing agreements for care and support, as in this case, has been held to be sufficient. See, also, *Townshend* v. *Vanderwerker*, 160 U. S. 171, 184; *Watson* v. *Hinman*, 20 Ind. 223, 226.

(6) The proof of possession, and other acts of part performance of the contract relied on, must, according to all of the authorities, refer to and be consistent with that contract,

as well as relate to and affect the land that is its subject. A more stringent rule has been insisted upon, and the following language of Chancellor Kent is relied on to support it:

"It is well settled, that if a party sets up part performance to take a parol agreement out of the statute, he must show acts unequivocally referring to, and resulting from, that agreement; such as the party would not have done, unless on account of that very agreement, and with a direct view to its performance; and the agreement set up must appear to be the *same* with the one partly performed. There must be no equivocation or uncertainty in the case. The ground of the interference of the court is not simply that there is proof of the existence of a parol agreement, but that there is *fraud* in resisting the completion of an agreement partly performed." *Phillips* v. *Thompson*, 1 Johns. Ch. 131, 148.

If this language must be taken to mean, as has been declared in some decided cases, that the acts of part performance are not sufficient if they merely refer unequivocally to some agreement of the nature relied on, but must themselves be evidence of that very agreement and of no other, it goes to an extreme that, in our opinion, is inadmissible. We think that the correct view is expressed by Professor Pomeroy, in his excellent treatise on Specific Performance. Sec. 107. After an examination of the cases, he says:

"In the vast majority of cases the evidence establishing the part performance, and the acts of part performance themselves, when established, do not, and, in the nature of things, can not fully show what are the terms of the agreement alleged and relied upon by the plaintiff, nor are they introduced for any such purpose. The judicial opinions which, in unguarded and careless language, would require the acts of part performance to prove the exact contract as alleged, are in this respect clearly erroneous. The true rule is that the acts of part performance must be such as to show that some contract exists between the parties; that they were done in pursuance thereof, and that it is not incon-

sistent with the one alleged in the pleading.    Whenever acts
of part performance are made out, which thus point to a con-
tract, the door is opened, and the plaintiff may introduce
additional parol evidence directed immediately to the terms
of the contract relied on."

The same doctrine is enounced in Fry on Specific Per-
formance, 'Secs. 559, 561.  See, also, *Shahan* v. *Swan*, 48
Ohio St. 25, 37; *Maddison* v. *Alderson*, L. R. 8 App. Cas. 467,
479.    In the case last cited, Lord Selborne quotes with ap-
proval the following language of Wigram, V. C., in *Dale* v.
*Hamilton*, 5 Hare, 369:

"It is generally of the essence of such an act (of part per-·
formance) that the court shall, by reason of the act itself,
without knowing whether there was an agreement or not,
find the parties unequivocally in a position different from
that which, according to their legal rights, they would be in
if there was no contract.

" Of this a common example is the delivery of possession.
One man without being amenable to the charge of tres-
pass, is found in the possession of another man's land.   Such
a state of things is considered as showing unequivocally
that *some* contract has taken place between the litigant
parties; and it has, therefore, on that specific ground, been
admitted to be an act of part performance.   But an act
which, though in truth done in pursuance of a contract, ad-
mits of explanation without supposing a contract, is not, in
general, admitted to constitute an act of part performance
to take the case out of the Statute of Frauds; as, for example,
the payment of a sum of money alleged to be purchase
money."   See, also, *Morphett* v. *Jones*, 1 Sev. 181.

Our conclusion is, that the acts of part performance should
not be equally referable to some other and entirely different
contract, or of doubtful applicability to the one alleged.
They must unmistakably tend to show not only that there
has been an agreement, but also one of the character relied
on, upon which it must throw light, and with which it must

not be inconsistent in any material particular. Any more stringent rule than this, it seems to us, would be inconsistent with the weight of authority which holds that posses-. sion alone, taken with the knowledge and consent of the promisor, is sufficient part performance; for clearly, such possession would not furnish the proof of the terms of the agreement in respect of the particular title to be conveyed— whether by deed or will, in fee, for life, or for a term of years—though not inconsistent with either.

Take the case of *Brown* v. *Sutton, supra,* for example: the possession there shown was equally consistent, without further proof of the terms of the contract, with a promise to convey, by deed or will, in fee or for life, and even with the mere expectation of a devise, as was found to be the case in *Maddison* v. *Alderson, supra.*

As this last case has been relied on by the appellant, the grounds of its decision will be examined. The plaintiff was the housekeeper of Alderson, who died in 1877. She entered his service, in 1845, as a servant upon wages, and years afterwards became housekeeper. Wages amounting to about £24 had been permitted to accumulate until some time in 1860. She then contemplated leaving him, and was induced to remain by his promise to devise to her a certain tract of land. He did leave a will in which he devised to her the land for life, but it was invalid for want of the attestation of witnesses. There was no evidence of the promise but the testimony of the plaintiff herself. The enforcement of the contract was refused, but on the sole ground that there was no " definite contract for mutual considerations, made between herself and him at any particular time. There was certainly no contract on her part which she could have broken by voluntarily leaving his service at any time during his life; and I see no evidence of any agreement by her to serve without or to release her claim to wages.

"If there was a contract on his part, it was conditional upon, and in consideration of, a series of acts to be done by ·

her, which she was at liberty to do, or not to do, as she thought fit; and which, if done, would extend over the whole remainder of his life. If he had dismissed her, I do do not see how she could have brought any action at law, or obtained any relief in equity." Per Lord Selborne, L. R. 8 App. Cas. 472.

The distinction, in respect of the point controlling the decision between that case and this is apparent.

Here, a "definite contract for mutual considerations" is alleged to have been made. Each was under obligation to the other, and neither was at liberty to withdraw without the consent of the other. As stated by the witness, James Schouler: "It was not optional for either party to terminate the arrangement without the consent of the other."

If, however, there were no difference between the two cases in respect of the obligation of the complainant to continue his care and support during life, we could not follow the decision in *Maddison* v. *Alderson* because it is opposed, on that very point, to the decision of the Supreme Court of the United States in *Brown* v. *Sutton, supra.*

There was no proof, in that case, that the promise was made to Mrs. Sutton in consideration of an express agreement by her to care for the promisor to the end of his life. The relations between them began some years before his purchase of the property in controversy, and promise to convey it to her. The promise of the conveyance, which he died without making, was in expectation that she would continue her care to the end of his life; but she could have terminated their relations at will without violation of any contract. The services that had been rendered by her, and their expected continuation during his life, were held a sufficient consideration for his promise, and, with the possession acquired, sufficient to entitle her to a decree against his heirs. The following extract from the opinion of Mr. Justice Miller is quite relevant to the leading facts of this case:

" There can be no question that Mr. Kenyon bought the property in dispute with the intention, clear and well defined in his own mind, that he was buying it for Mrs. Sutton; and when he came to build the house upon it there can be as little doubt that he erected it for her with the intention that it should be her house expecting to live with the Suttons as long as he lived, and that it would go to her in the event of his dying before she did. It may be said, and it is true that this unexecuted purpose of his is not of itself sufficient to constitute a contract to convey to |her the house, nor would it alone be sufficient foundation for a decree; but it leaves the case in such a position that no very strong evidence is required that such a contract did exist, as it would be entirely consistent with all the other uncontradicted testimony in regard to what he had said and done and with the possession; of the property by her. There is also quite a sufficient consideration for such a promise in the services, care and attention rendered by her to an old man in his declining years, in connection with the fact that at the time he bought this property he was very sure of receiving these attentions as long as he lived. The evidence shows that this expectation on his part was fully realized." 129 U. S. 242.

4. This brings us to the consideration of the evidence directed particularly to the agreement and its terms.

Complainant, testifying on his own behalf, stated the agreement as follows:

" Pursuant to the conversations we had had and the communications that had passed between us prior to their arrival, they came to live with us as a mother and a father would come to live with children, and their dwelling with us was conditional upon a covenant and agreement entered into that in consideration of permitting them to reside with us in this relationship during the balance of their lives and the services and care to be given to them that he would build a house in the city of Washington, District of Co-

lumbia, in which we should live together, and that at his death, not only the house, but all of his property should be willed to me." ·

Here he was interupted by an objection to the evidence, which, having been disposed of, he proceeded—

"And Dr. Piper further stated that should I be taken away that he would provide for Mrs. Hay and the children as if they were his grandchildren and she his daughter, and that should both of us be taken away during his lifetime that he would likewise provide for the children, and that he would rear and raise them, and upon this Mrs. Piper and Dr. Piper, Mrs. Hay and myself shook hands, and the doctor himself called upon Heaven to witness the sincerity of the agreement."

He further testified that Dr. Piper and wife were to pay no board, and that they made no contribution towards the family expenses during the years of their residence with him.

Mrs. Anna Kearfoot, a witness for the complainant, testified to the agreement substantially as stated by the complainant. She was living in the house at the time, was present when the agreement was restated by all of the parties, and saw them clasp hands in token of good faith. ·

A number of witnesses, whose veracity there is no good reason to doubt, testified to declarations made by Dr. Piper and his wife during their residence with complainant in the P street house, during the construction of the Corcoran street house, and after the removal of all parties to the latter, tending to establish the general terms of the mutual agreement as asserted by complainant. Among the most important of these are James Schouler, Esq., and his wife, whose relations with Dr. Piper and his wife have been heretofore stated. He said that his impression formed from all that he had heard was that the Corcoran street house was built as a common home where Dr. and Mrs. Piper would live for the rest of their lives with the Hay family, and that they regarded Edwin B. Hay as an adopted son, substantially

15 Ct. App.—14

intending that he should have the property at their death. He could recall no particular conversation with Dr. and Mrs. Piper, but stated that all they had said at different times gave him the idea of the joint arrangement stated. On cross-examination he said:

"Ans. 4. I understood that the house was built expressly for the Pipers and Hays to live together during the lives of the old people, and then to go to Mr. Hay and his family in consideration of giving Dr. and Mr. Piper a home. All his statements on this subject were the same on all occasions.

"Ans. 5. He always gave me to understand that the arrangement was to continue for life. I knew nothing of what was to be paid or the terms of board, but understood it was not optional for either party to terminate the arrangement without the consent of the other.

"Ans. 6. I never was informed whether there was any agreement in writing or not. I never was shown any such agreement and never was told of any specific terms of agreement.

"Ans. 7. My answer to the 19th interrogatory is founded on no special conversations, but on the general tenor of our intercourse.

"Ans. 8. I never saw any noticeable instances of care and affection while at the house of Dr. and Mrs. Piper. Both appeared well and there was no need of it. I never witnessed any ostentatious or affected demonstration of affection, and if there had been any I think I would have noticed it. Mr. Hay and his wife appeared simple and sincere, and the whole mutual intercourse was familiar and unstrained."

Mrs. Schouler's testimony was substantially similar. She stated also that her first information of the arrangement came from Mrs. Piper at Dr. Piper's request.

The evidence offered by the defendant of declarations made by Dr. Piper indicating his dissatisfaction with the arrangement and displeasure with the complainant, and the fact of his change in his will has been referred to in

the preliminary statement, and is comparatively unimportant. Nor do we give any weight to the testimony of Dr. Piper himself. He is contradicted on many material points by the statements made in his own letters, and by overwhelming proof of his declarations to the contrary.

It is just, however, to say that his whole deposition tends to corroborate the evidence of the impairment of his mind and memory after December, 1892.

The most important evidence on behalf of the defendant was produced on the cross-examination of the complainant. An instrument was shown him, the execution of which he admitted. It is a formal contract of lease between Dr. Piper and him, bearing date October 20, 1893. Dr. Piper lets him the Corcoran street house from January 1, 1894, to January 1, 1897, reserving to himself the use of his private rooms. Complainant agrees to keep in repair, pay all taxes and pay lessor $200 per annum in quarterly instalments. There are the usual stipulations against subletting, for delivery of possession at end of term, and so forth. Dr. Piper was then in Chicago, under care of S. G. Thomas, and this lease was sent to complainant by mail, and executed and returned after the exchange of correspondence.

Complainant explained the causes which led him to execute the lease as follows:

"I signed the paper. It was upon the importunities of a letter from Mr. Thomas, purporting to be from Dr. Piper, stating that his rents were not coming in very rapidly, and that he was somewhat under expense, having to pay his board, and asking if I could be of any help to him in the way of an allowance. Realizing the situation of Dr. Piper, and not knowing what might be done by Thomas to rob both Dr. Piper and myself of the home, and wishing to make an allowance to Dr. Piper, to which he was entitled, I signed this lease, knowing that whatever might occur it would hold me in possession of the property at least during its existence, and that before that time the adjustment of

the matters by Dr. Piper and myself would be consummated, looking to his return home and his continuing with us, in accordance with our agreement. I complied with the terms of the lease, after it was signed by me, and I never denied the right of Dr. Piper to have an allowance made to him, if he so desired it."

He further said that this paper was not intended to release Dr. Piper from the original agreement, and that the allowance to him in lieu of board seemed justifiable whether made in that form or another.

Complainant's explanation is borne out by the following evidence:

Along with the lease the following paper was sent to him for execution and return:

"Whereas, certain dealings and agreements have heretofore been had and made between Edwin B. Hay and Richard U. Piper, among which were certain agreements and transactions in relation to the house No. 1512 Corcoran street, in the city of Washington, D. C., and

"Whereas, the said parties have, this day, made a full settlement of all amounts, accounts and agreements heretofore had, made and entered into between them,

"Now, therefore, I, Edwin B. Hay, do hereby acknowledge that I have received full payment and satisfaction of all the claims and demands in any way arising or growing out of any agreements or transactions heretofore had between the said Piper and myself; and, further, that I have no claim or interest of any kind or nature in the premises above described, No. 1512 Corcoran street in the city of Washington, D. C., except the leasehold interest which I have therein under the lease from the said Piper, bearing even date herewith.

"In witness whereof, I have hereunto set my hand and seal this 20th day of October, 1893."

This paper complainant persistently refused to execute although Dr. Piper continued to request him to do so. In a

letter dated April 19,1894, after referring to the paper he said:

" I don't see why you can not please me in this by doing as I have several times requested. You know I have treated you fairly in my will. Perhaps I have already done more for you than I ought."

Another of the same purport bears date July 29, 1894. Dr. Piper subsequently told complainant that the whole was a part of a scheme of Thomas; and the facts showing his physical and mental condition, with Thomas' control over him, and his execution of the conveyances for Thomas' benefit, strongly corroborate his statement. Thomas was aware of the relations of the parties and must have learned of the agreement between them from Dr. Piper. Upon no other ground than that there was an agreement of the kind claimed by complainant can the insistence either of Thomas or Dr. Piper upon the execution of this release be accounted for. This must be included in the "certain dealings and agreements" referred to in the preamble. If complainant was nothing more than a tenant of Dr. Piper before, as is contended, what was the necessity for this release after he had executed a renewal of that lease and made its termination certain?

Taking into consideration all of the evidence showing the beginning of the relations of the parties and the acts performed by each during the more than five years of their life together, there are but two possible explanations of the conduct of the complainant.

One is referable to the agreement which is the foundation of the suit. The other is, that, owing no duty to Dr. Piper and his wife, the complainant took them into his home, gave them board, and cared for them as if he were their son in fact, without contract, or promise of reward, express or implied, but solely in the hope or expectation that they would voluntarily make a will in his favor.

In our opinion, the agreement has been substantially and sufficiently proved.

It affords the most reasonable explanation of the acts of the parties, and is consistent with all the surrounding circumstances.

Whilst such agreements are frequently unfortunate for all concerned, and not always commendable, they may, as we have seen, be specifically enforced.

The decree appealed from will be affirmed, with costs.

*Affirmed.*

Mr. Chief Justice ALVEY, concurring:

I concur in the affirmance of the decree in this case, but, I must say, that I do so with great doubt and hesitation. The case, on the facts as proved, shows a strong claim for compensation on a *quantum meruit*; but as a case for specific performance of an express contract, with the Statute of Frauds relied on as a defense, it is quite different, and presents great difficulty and doubt to my mind, both as to the proof of the specific contract alleged, and the part performance thereof, to take it out of the bar of the statute. I yield my doubts, however, in deference to the opinion of my brother judges.